**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STEPHEN J. DEAN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 05 C 4844 ) ) Magistrate Judge Geraldine Soat Brown |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stephen Dean ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his request for a waiver of recovery of an overpayment of $23,059 in Disability Insurance Benefits ("DIB") awarded pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C. § 401 *et seq*. Before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, Plaintiff's motion is granted, and the case is remanded for consideration of whether requiring Plaintiff to repay the overpayment would defeat the purpose of the Act or be against equity and good conscience. The Commissioner's motion for summary judgment is denied.

### BACKGROUND[1]

As a result of major medical problems associated with obesity, hypertension, mental illness,

---

[1] The record in this case contains many gaps, making the task of setting out the factual background in this case a difficult one. This opinion attempts to set out the facts in the most logical and readable manner possible, notwithstanding these gaps.

and alcohol abuse, Plaintiff applied for DIB in June 1989, alleging that he became disabled on October 31, 1988. (R. 27-30, 66-69, 405.) He was found disabled with an onset date of October 31, 1988 (R 86-87), and became entitled to benefits for the period beginning April 1989. (R. 87.) Plaintiff returned to work and completed a nine-month trial work period between July 1991 and April 1992. (R. 56-60.)[2] Having completed his trial work period, Plaintiff began an extended period of eligibility in May 1992. (R. 85, 111.)[3]

In 1996 and 1997, the Social Security Administration ("SSA") conducted reviews of Plaintiff's continuing eligibility for benefits. (R. 43-73, 82-92.) Under the applicable regulations, a claimant on disability may work for pay, as long as claimant's work does not constitute "substantial gainful activity." 20 C.F.R. § 404.316(d). The SSA usually finds work to be "substantial" if the gross earnings average exceeds a certain limit after deduction of "allowable amounts" for certain work-related expenses. (R. 114.) Prior to 1999, the limit was $500; beginning in July 1999, the limit was $700. (*Id*.) The SSA concluded in both 1996 and 1997 that Plaintiff's disability was continuing because his average monthly earnings (after exclusion of impairment-related work expenses) were less than the regulatory limit at that time of $500. (R. 56, 70, 84-88.) In November 1997, the SSA notified Plaintiff that, "[a]lthough you are now working . . . we find that the work you have been doing does not show that you can do substantial work." (R. 88.)

In around January 1998, the SSA conducted another review of Plaintiff's continuing

---

[2] A trial work period is a period of nine months (which need not be consecutive) during which a DIB claimant may test his ability to work despite his health problems. 42 U.S.C. § 422©); 20 C.F.R. § 404.1592.

[3] During an extended period of eligibility, a DIB claimant receives benefits as long as his work does not constitute "substantial gainful activity" and his health problems continue to meet the Social Security Administration's (SSA's) guidelines. 42 U.S.C. § 423(e)(1).

eligibility for benefits. (R. 372-75.) During that review, Plaintiff reported that he was working 30 hours per week as a merchandise clerk at J.C. Penney and earning wages ranging between $6.00 and $6.35 per hour (which amounted to about $780 in gross monthly wages). (R. 372-74, 401.) Although Plaintiff's gross monthly earnings were above the regulatory limit of $500, the SSA determined that there should be "[n]o change in benefits." (R. 375.)

In April 2000, the SSA again reviewed Plaintiff's continuing eligibility for benefits. (R. 93-94.) Plaintiff reported that he was working 25 hours per week at J.C. Penney and earning wages ranging between $6.00 and $7.20 per hour (or, again, approximately $780 in gross monthly wages). (R. 95-108, 401.) The SSA considered Plaintiff's earnings and impairment-related work expenses for 1998 and 1999 and determined that Plaintiff's entitlement to DIB should have ended approximately two years earlier, in April 1998. (R. 110-15, 354-58.) The SSA's determination was based on its finding that Plaintiff's earnings were "substantial," or above the regulatory limit, as of January 1998. (R. 114, 354.)[4] (R. 110.) Thus, in 2000, the SSA determined that Plaintiff's work in January 1998 was substantial, although the SSA had not terminated his benefits as a result of its review in January 1998.

Plaintiff was notified of the SSA's determination through a proposed disability cessation decision dated June 27, 2000 and a final determination dated July 7, 2000. (R. 113-15, 354-58.) The SSA stated that because Plaintiff had received benefits past the April 1998 cutoff date (and in fact was still receiving benefits), he had been overpaid in the amount of $22,841 for the months of April 1998 through June 2000. (R. 354-55.) The SSA stopped paying Plaintiff benefits that month,

---

[4] The entitlement to DIB was to have ended in April 1998, three months after Plaintiff began performing "substantial" work in January 1998, because the SSA will pay DIB for the month that disability ends as well as the following two months. (R. 114.)

in July 2000, and notified Plaintiff that he would be required to refund the overpayment. (R. 297-98, 354-58.)

In September 2000, Plaintiff requested that the overpayment recovery be waived, claiming that the overpayment was not his fault and that he could not afford to repay it. (R. 118-25.) The SSA denied Plaintiff's request on the basis that he had received correspondence explaining the effect his working had on his monthly benefits, and therefore could not be found without fault. (R. 126, 127-30.) Specifically, Plaintiff had received correspondence stating that he must report any changes in his pay to the SSA, and that the SSA would stop paying him DIB if he earned more than $500 per month. (R. 35-37, 56-60, 70-73, 88-92.)

In October 2001, Plaintiff and his attorney appeared at a personal conference with the SSA to appeal the SSA's decision not to waive recovery of the overpayment. (R. 131.)[5] During the conference, Plaintiff's attorney explained that Plaintiff was not at fault for the overpayment, as he had increased his work hours at his supervisor's request (putting his earnings above the "substantial" level) because "he was unable to say no to his superiors even if it would harm him." (*Id.*) Plaintiff's attorney secured a letter from Plaintiff's treating psychiatrist supporting that fact, which stated that Plaintiff "would be emotionally incapable of saying no if he were asked to work additional hours" and would "have been unable to understand he would lose his [benefits] if he earned too much." (R. 253.) Also at the conference, Plaintiff's attorney requested that the disability cessation determination be reviewed to determine if additional impairment-related work expenses would alter the decision. (R. 133.)

---

[5] Around the time of the conference, Plaintiff stopped working after undergoing eye surgery for glaucoma. (R. 402, 410.)

Upon reviewing the disability cessation determination, the SSA determined that Plaintiff ceased being disabled (*i.e.*, engaged in substantial gainful activity) in December 1997 rather than January 1998. (R. 133-37, 145-46, 157.) That determination was based on the SSA's finding that Plaintiff's wages were above the $500 limit as of December 1997. (R. 134.) As a result of that decision, the SSA also revised the benefit termination month from April 1998 to March 1998 (and thus the overpayment period was increased by one month). (R. 133-37, 145-46, 153.) At that same time, the SSA reaffirmed its denial of Plaintiff's request for a waiver of the recovery of the overpayment for the months of April 1998 (now, March 1998) to June 2000. (R. 138-43.) The SSA explained that because Plaintiff's wages had increased in June 1998, Plaintiff knew or should have known that his work activities and earnings would affect his eligibility for benefits. (R. 139.)[6] The SSA stated that if Plaintiff had "reported this increase in wages timely, the rest of the overpayment may have been avoided." (*Id.*) Notably, the SSA's memorandum regarding its determination states that the SSA "made an incorrect continuance determination and sent [Plaintiff] a notice dated 11/06/97." (R. 133.) It also notes that a "second incorrect Cess[ation] determination was made 06/27/00." (*Id.*)

While Plaintiff was disputing the overpayment refund, he filed a new application for disability benefits. (R. 19, 109.) In January 2001, the SSA sent Plaintiff a letter reflecting a preliminary decision to award Plaintiff benefits again. (R. 301.) That letter advised Plaintiff that

---

[6] The record is not entirely clear regarding Plaintiff's earnings in 1998 and 1999. One exhibit indicates that Plaintiff's gross monthly wages increased only $30 between 1998 and 1999. (R. 110.) Another report in the record indicates that a somewhat larger increase in Plaintiff's wages occurred in June 1998. (R. 134.) However, that report shows that Plaintiff's wages rose in June 1998 after having dropped between February and May 1998, and that the increase in June put Plaintiff's wages at a level that was not much higher than what they had been in January 1998, when the SSA continued his benefits. (*Id.*)

he would receive a check for $1,688, which included benefits due to him through January 2001, and a check for $844 every month after that. (R. 301.) The SSA instructed Plaintiff that if he received more than one check for any month, he should notify the SSA right away because it might mean he was being overpaid. (*Id*.) The SSA further instructed Plaintiff that if he was overpaid, he might have to pay back the overpayment or the SSA might retain some of his future benefits. (*Id*.) In May 2001, Plaintiff received a final determination from the SSA regarding his second application for DIB. (R. 307.) The Award stated that Plaintiff had been found disabled as of December 31, 1999 and was entitled to monthly benefits beginning January 2000. (*Id*.) The Award further stated that Plaintiff would receive a check for $844 every month, as well as a check for $11,012, which it stated represented the benefits Plaintiff was owed through January 2001. (*Id*.) Plaintiff in fact received checks for those amounts; specifically, he received one check for $11,012, one check for $1,688, and monthly checks for $844 which were subsequently increased to adjust for the cost of living.

As the foregoing facts reveal, the SSA's handling of this case was confusing and inconsistent. By the SSA's own admission, incorrect determinations were made and incorrect information provided to Plaintiff. For example, in 2001, the SSA determined that Plaintiff was disabled for the period of January 2000 through February 2001, and sent him checks for those months, although it was simultaneously trying to recover from Plaintiff its previous payments to him for some of those same months (January to June 2000) on the ground that he was <u>not</u> disabled during those months.

In March 2002, the SSA increased the amount for which it was seeking overpayment recovery by $1,688 to $24,529. (R. 138-39.) With respect to that increase, the SSA explained that "[w]hen the second [disability] claim was processed, [Plaintiff] was paid full retroactive benefits in

spite of the fact that he had been previously paid for that time period." (R. 138.) Thus, Plaintiff was overpaid a second time because of the SSA's error.[7]

In April 2002, Plaintiff's attorney sent the SSA a letter requesting a hearing before an Administrative Law Judge ("ALJ") regarding the overpayments. (R. 144, 158.) As of the time of the hearing before the ALJ, Plaintiff continued to receive benefits, from which the claimed overpayment was being deducted at a rate of $50 per month. (R. 20, 23.)[8]

## THE HEARING BEFORE THE ALJ

Following a pre-hearing conference in September 2003, Plaintiff appeared with his attorney on November 13, 2003 and testified at a hearing before an ALJ. (R. 380-413.) At the hearing, Plaintiff testified that he was being treated for obesity, high blood pressure, gout and an anxiety disorder, and that he takes Risperdal and Tegretol. (R. 405.) Plaintiff further testified that his memory was "not that good." (R. 408.) He stated that he last worked on October 31, 2001 as a merchandise clerk at J.C. Penney, where he performed merchandise preparation and clothes tagging. (R. 401-02.) He obtained his position there with the assistance of a job coach. (R. 409.) Plaintiff explained that the number of hours he worked at J.C. Penney increased during his employment there, but he did not discuss it with the SSA because he "thought [he] was okay with it." (R. 410.) He stated that he had worked at J.C. Penney's for three or four years before undergoing eye surgery and

---

[7] The ALJ's opinion notes a number of other errors by the SSA in its handling of Plaintiff's claims and those of Plaintiff's dependant children, exacerbating the confusion. (R. 23.)

[8] It is not clear whether Plaintiff currently receives benefits. The ALJ's opinion reflects at least one subsequent determination by the SSA that Plaintiff was overpaid in May 2004, and suggests that the SSA re-examine Plaintiff's continuing eligibility. (R. 23-24.)

losing his sight in his right eye, making it difficult for him to perform his job. (R. 402-03, 410.) After the surgery, Plaintiff's supervisor gave Plaintiff the option of either resigning or being terminated after he received a note from Plaintiff's physician stating that Plaintiff could no longer perform his job. (R. 402-03.) Plaintiff ultimately resigned from his job. (R. 403.) He subsequently applied for and received unemployment compensation for about nine months, during which time he looked for another job but was not hired anywhere. (R. 403-04.) Plaintiff testified that he had completed every form sent to him by the SSA. (R. 410-11.)

Plaintiff testified that he has lived at the same address for 13 years and relies upon his disability payments of $917 per month to pay his monthly rent of $640 and household expenses, which include $30 for a telephone and $15 for electricity. (R. 398-99.) He stated that he gets his food from a food pantry and that $50 per month has been withheld from his benefits since 2002 as part of the SSA's recovery of the overpayments. (R. 399.)

Plaintiff testified that he used the benefits money he received in February 2001 to repay debts to his father and uncle, pay his general living expenses, and help out his daughters, who were homeless at the time. (R. 406, 411-12.) Plaintiff stated that he does not have a savings account or own any real property, stocks or bonds. (R. 409.)

After the hearing, Plaintiff's attorney submitted an updated letter from Plaintiff's treating psychiatrist in which he opined that, in his professional opinion, Plaintiff's condition between March 1998 and November 1998 was "the same, not better, and perhaps worse than described in [his] letter of October 8, 2001." (R. 376-77.)

# THE ALJ'S DECISION

In a decision dated March 24, 2004, the ALJ found that Plaintiff had received DIB overpayments in the amount of $23,059. (R. 26.) Specifically, the ALJ determined that Plaintiff was overpaid $16,187 from March 1998 through June 2000, and $6,872 from July 2000 to January 2001. (R. 22, 26.) The parties do not dispute the ALJ's findings with respect to the amounts overpaid. Plaintiff's overpayment of $23,059 was reduced by a partial benefit withholding at the rate of $50 per month which began in June 2002 and continued through January 2004. (R. 23.) During that twenty-month period, $1,000 was withheld from Plaintiff's benefits to reduce his overpayment amount to $22,059. (R. 23.)

In his decision, the ALJ concluded that Plaintiff was not without fault in causing the overpayments, and therefore was not entitled to a waiver of recovery of the overpayments. (R. 26.) The ALJ found that, with respect to the first overpayment, Plaintiff was "fully able to pay attention to the kinds of details which he was required to report to the [SSA], such as earning more than the regulatory limit." (R. 25.) With respect to the second overpayment, the ALJ found Plaintiff to be at fault because "[he] did not question the validity of the payments he received in February 2001 . . . [and] knew or should have known that he had probably received duplicate payments for at least some of the months in the retroactive period." (*Id*.) The ALJ directed the SSA to make a determination as to whether Plaintiff continued to meet the eligibility requirements for DIB and, if he did, recommended that recovery of the overpayment be resumed at the rate of $50 per month until the debt was fully recovered. (R. 26.)

**LEGAL STANDARDS**

**I.      Standard of Review**

The Commissioner's decision denying a claimant's request for a waiver of recovery must be affirmed if it is supported by substantial evidence. *See* 42 U.S.C. § 405(g) (stating that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"); *see also Banuelos v. Apfel*, 165 F.3d 1166, 1169 (7th Cir. 1999), *overruled on other grounds, Johnson v. Apfel*, 189 F.3d 561, 562 (7th Cir. 1999). Judicial review is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Stevenson v. Chater,* 105 F.3d 1151, 1153 (7th Cir. 1997). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938). A reviewing court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990).

**II.     Legal Standard for Waiving Recovery of an Overpayment**

A DIB overpayment occurs when an individual receives more than the "correct amount of payment" he is due. 42 U.S.C. § 404(a); 20 C.F.R.§ 404.501. Once an overpayment has been made, the SSA must seek a refund from the individual to whom it has mistakenly made an overpayment of benefits. 42 U.S.C. § 404(a); 20 C.F.R.§ 404.502.

The SSA can waive the recovery of an overpayment if (1) the individual is "without fault,"

and (2) recovery would either "defeat the purpose" of the Act or be "against equity and good conscience." 42 U.S.C. § 404(b); 20 C.F.R. § 404.506(a). The individual has the burden of proving his entitlement to waiver of repayment. *Banuelos*, 165 F.3d at 1170. Although the SSA may have been at fault in making the overpayment, the individual is not absolved of liability if he is not without fault. 20 C.F.R. § 404.507.

An individual is not without fault where the overpayment resulted from: "(a) [a]n incorrect statement made by the individual which he knew or should have known to be incorrect; or (b) [f]ailure to furnish information which he knew or should have known to be material; or (c) [w]ith respect to the overpaid individual only, acceptance of a payment which he either knew or could have been expected to know was incorrect." 20 C.F.R. § 404.507(a)-(c)). When determining whether an individual is without fault in causing the overpayment of benefits, the SSA is required to specifically take into account the individual's age and intelligence as well as any physical, mental, educational, or linguistic limitation the individual may have. 42 U.S.C. § 404(b); 20 C.F.R. § 404.507.

Next, recovery of the overpayment would "defeat the purpose" of the Act if the repayment would deprive an individual of income needed for ordinary and necessary living expenses. 20 C.F.R. § 404.508(a). An individual's ordinary and necessary living expenses include fixed living expenses such as food, clothing, rent, mortgage and utility payments, insurance, taxes, and medical expenses. 20 C.F.R. § 404.508(a)(1)-(4). Recovery of an overpayment would "be against equity and good conscience" if an individual (1) changed his position for the worse or relinquished a valuable right as a result of reliance upon a notice that a payment would be made or because of the overpayment itself; or (2) was living in a separate household from the overpaid person at the time of the overpayment and did not receive the overpayment. 20 C.F.R. § 404.509(a)(1)-(2). An

individual's financial circumstances are not material to a finding that recovery of an overpayment is "against equity and good conscience." 20 C.F.R. § 404.509(b).

**ANALYSIS**

Plaintiff asserts that the ALJ's decision should be reversed and he should be granted a waiver of recovery of the overpayment. (Pl.'s Mem. at 12.) In the alternative, Plaintiff argues that the matter should be remanded for a supplemental hearing in order to consider the appropriate legal criteria that should be used with respect to the issues in this case, and specifically whether requiring him to repay the overpayment would defeat the purpose of the Act or be against equity and good conscience. (*Id.*; Pl.'s Reply at 4.)

I.  **The ALJ's Decision regarding Plaintiff's "Fault"**

   A.  **First Overpayment**

Plaintiff argues that the ALJ erred in failing to consider any of the factors enumerated in 20 C.F.R. § 404.507, and states that he complied with those factors and therefore was not at fault. (Pl.'s Mem. at 8.) With respect to subsection (a) – whether the overpayment was caused by an incorrect statement which Plaintiff knew or should have known to be incorrect – Plaintiff argues that he never provided any incorrect statements or information to the SSA. (Pl.'s Mem. at 8, 9.) The Commissioner does not dispute that point, and has not pointed to any evidence tending to show that the overpayment was caused by an incorrect statement by Plaintiff.

With respect to subsection (b) – whether the overpayment was caused by Plaintiff's failure to furnish information which he knew or should have known to be material – it is unclear whether

the Commissioner even contends that Plaintiff is at fault under that subsection or whether the ALJ based his decision on this subsection, because the ALJ's opinion does not expressly state the subsection upon which he based his conclusion, and the Commissioner's brief to this Court focused her entire argument on subsection (c). However, the Court will consider whether substantial evidence would support a conclusion against Plaintiff under subsection (b), that is, that the overpayment was caused by Plaintiff's failure to furnish information which he knew or should have known to be material.

Plaintiff argues that the records demonstrate a pattern of his timely and correctly reporting his earnings and work activities. (Pl.'s Mem. at 8.) He notes as an example that he provided information regarding his work activities in January 1998, which showed that his work constituted substantial gainful activity under the regulations, yet the SSA continued his entitlement to benefits, giving him "every reason to believe that the subsequent benefits he received were proper." (*Id*. at 8-9.) The Commissioner responds that Plaintiff "did not notify the [SSA] at the time his work hours increased . . . [and] did not have a reasonable basis for believing there should be no change in his disability status when his earnings increased." (Def.'s Resp. at 7.)

The evidence does not support a conclusion that the overpayment resulted from Plaintiff's failure to furnish information which he should have known to be material. The ALJ's opinion does not identify any specific information Plaintiff failed to supply that caused the overpayment. Instead, the ALJ's decision simply states that Plaintiff was able to pay attention to the kinds of details which he was required to report to the SSA, such as earning more than the regulatory limit. (R. 25.) However, in January 1998, Plaintiff accurately reported earnings which were above the substantial gainful activity level, yet the SSA found that he was still entitled to benefits. Plaintiff also testified

that he completed every form sent to him by the SSA (R. 411), and the Commissioner did not dispute that evidence. Furthermore, the fact that Plaintiff had the requisite mental capacity to report such information does not support a conclusion that Plaintiff failed to furnish information to the SSA *which he knew or should have known to be material*. Significantly, the earnings limit is not simply $500 or $700; the earnings limit is net after allowable deductions for wage-related expenses. (R. 114.) The record reflects that even the SSA had some difficulty computing Plaintiff's earnings and related expenses. *See, e.g.*, R. 135-137. Likewise, the evidence does not support a conclusion that a failure by Plaintiff to supply information *caused* the SSA to make the overpayments. On the contrary, in January 1998, Plaintiff provided accurate information; it was the SSA's own erroneous calculations that resulted in the continuation of Plaintiff's benefits. For all of these reasons, if, in fact, the ALJ concluded that the overpayment was caused by Plaintiff's failure to furnish information which he knew or should have known to be material, that conclusion is not supported by substantial evidence.

As for subsection (c), Plaintiff asserts that he could not have known or been expected to know that the DIB payments he was receiving were incorrect because he provided the SSA with correct and material information regarding his employment indicating he was earning wages well above the substantial gainful activity limit of $500 per month and, therefore, had no reason to believe that "anything was amiss." (Pl.'s Mem. at 9; Pl.'s Reply at 1-2.) The Commissioner argues that Plaintiff should have known the payments he accepted were incorrect, because he "did not question" the SSA regarding its decision to continue his benefits when his earnings were above the substantial gainful activity limit. (Def.'s Resp. at 7, 8.)

The Court concludes that the ALJ's decision that Plaintiff should have known that the

benefits he received in the first overpayment were incorrect is not supported by substantial evidence. First, as even the Commissioner acknowledges, Plaintiff explained why he never questioned the SSA about his continued receipt of benefits. He stated that he thought his wages were calculated on the basis of his net earnings rather than gross earnings and that his expenses reduced his countable earnings. (Def.'s Resp. at 7, 8; R. 109, 131.) In addition, as another record indicates, Plaintiff explained that he was told by a receptionist at the SSA "[not to] worry about it" when he reported his work activities, and states that he never got a definitive response when he tried to get clarification from the SSA regarding which of his expenses were deductible. (R. 131.) *See also* R. 119 (stating that Plaintiff visited the SSA four to five times to report his income). Plaintiff's explanations support the conclusion that Plaintiff reasonably believed that the payments he was receiving were correct. This conclusion is further bolstered by the fact that several times the SSA continued Plaintiff's entitlement to benefits based on accurate information he furnished showing earnings above the $500 limit. The ALJ's conclusion that Plaintiff should have known that the DIB payments he accepted were incorrect is not supported by substantial evidence.

Thus, the ALJ erred in determining that Plaintiff was not without fault in causing $16,187 in overpayments during the first overpayment period (i.e., March 1998 to June 2000). (R. 25-26.)

### B. Second Overpayment

With regard to the second overpayment period (i.e., July 2000 to January 2001), the ALJ concluded that Plaintiff was again not without fault, as it was incumbent upon him to question the validity of two payments received within a few days of each other. (R. 25.) According to the ALJ's decision, Plaintiff should have known that he received duplicate payments for at least some of the

months when they appeared to be incorrect and there was no accompanying letter of explanation. (*Id*.) Again, the ALJ did not cite any specific subsection of § 404.507, but the finding suggests that the ALJ's determination that Plaintiff was not without fault was based on subsection (c).

Plaintiff argues that the overpayments were not predicated on either his providing incorrect statements regarding his employment or his failure to furnish pertinent, material employment information to the SSA pursuant to subsections (a) and (b). (Pl.'s Mem. at 10-11.) As for subsection (c), Plaintiff argues that he had a reasonable basis for assuming that he was not being overpaid because he had always promptly reported his work activities and notified the SSA when his gross wages were in excess of the relevant substantial gainful activity limit. (*Id*. at 11.) In addition, Plaintiff argues that he assumed the payments were correct, regardless of the fact that he received multiple payments within days of each other, as he had requested a waiver of recovery of the first overpayment, and had been awarded retroactive benefits for a second period of disability. (*Id.*) Plaintiff claims that, in light of those events, he could not have been expected to know that the disability benefits he received during the second overpayment period were incorrect. (*Id*.) The Commissioner responds that Plaintiff was at fault because he did not question the agency's delivery of a check covering the same period for which he was shown to have been overpaid. (Def.'s Resp. at 8.)

The ALJ's decision on this issue is not supported by substantial evidence. The ALJ states that it was incumbent upon Plaintiff to question the validity of a check "when it appears to be incorrect, particularly when no letter of explanation is provided." (R. 25.) However, the ALJ did not explain – and it is certainly not apparent – why Plaintiff should have presumed the checks to be incorrect, or why Plaintiff should have disregarded the letters of explanation that *were* provided with

-16-

the checks. On January 31, 2001, Plaintiff received a letter stating that he would receive a check for $1,688, which included benefits due him through January 2001. (R. 301.) There is no reason why Plaintiff should have believed that check was sent to him in error, and the ALJ does not provide any reason. In that letter the SSA advised Plaintiff, "When we finish our work on your claim, we will send you a letter explaining your benefit amount." (R. 301.) Subsequently, Plaintiff received a letter stating that he was entitled to benefits beginning January 2000 and that his first check would be for $11,012. (R. 307.) Again, there is no reason, and the ALJ does not provide any, why Plaintiff should have believed that check was incorrect, either. Plaintiff was being paid retroactive benefits for more than a one-year period (January 2000 to February 2001). Given the large period of time covered (and the amount of Plaintiff's monthly benefits), a check for $11,012 would not seem obviously incorrect. Indeed, not all of the payment Plaintiff received at that time was an overpayment; the ALJ determined that only $6,872 of the amounts Plaintiff received in February 2001 was overpaid.

Nor was Plaintiff required to conclude that one of the checks was incorrect simply because he received two checks in close proximity. The first check of $1,688 was referenced in conjunction with what appears to be a preliminary decision regarding Plaintiff's benefits and which specifically stated that a second letter explaining the benefits in more detail would be forthcoming. (R. 301.) The second check of $11,012 was referenced in conjunction with that second letter, which Plaintiff had been told was forthcoming. (R. 307.) In short, given the timing and the content of these two notifications, it cannot be said that Plaintiff should have been expected to know that the payments he received were incorrect. Rather, Plaintiff could have reasonably believed that the payments were correct, as he had been contesting the first overpayment period by requesting a waiver of recovery

and had been awarded benefits for a second period of disability which partially overlapped the prior period of overpayment. (Pl.'s Mem. at 10-11.) Accordingly, the ALJ's determination that Plaintiff was at fault with respect to the second overpayment because he did not question the validity of those checks is not supported by substantial evidence.

Thus, the Court finds that the ALJ's determination that Plaintiff was not without fault in causing $6,872 in overpayments for the second overpayment period (i.e., July 2000 through January 2001) is not supported by substantial evidence. (R. 25-26.)

## II.     Whether Repayment Would Defeat the Purpose of the Act or be Against Equity and Good Conscience.

Because the ALJ found Plaintiff to be not without fault in causing both the first and second overpayments, he did not address whether repayment would defeat the purpose of the Act or be against equity and good conscience, as required under the relevant regulations. 20 C.F.R. § 404.506(a). Plaintiff requests that this Court make a finding that he is entitled to a waiver or, alternatively, that the case be remanded for consideration of whether recovery of the overpayment would defeat the purpose of the Act or would be against equity and good conscience. (Pl.'s Reply at 4; *see also* Pl.'s Mem. at 12.)

Recovery of the overpayment would defeat the purpose of the Act if the repayment would deprive an individual of income needed for ordinary and necessary living expenses, including food, clothing, rent, utility payments and medical expenses. 20 C.F.R. § 404.508(a). At the hearing, Plaintiff testified that he received monthly disability benefits of about $917 and his expenses were about $685 a month, which consisted of only rent and utilities (electricity and telephone expenses), as he obtains his food from a food pantry. (R. 399.) From prior forms submitted by Plaintiff to the

SSA, it appears that Plaintiff's monthly expenses were as high as $1,474.91 in September 2000 (which included $325 in food expenses, $50 in clothing expenses, $103 in medical expenses, and $43 in Alcoholics Anonymous donations). (R. 123-24.) *See also* R. 172, 229-35, 239 regarding Plaintiff's monthly medical expenses. Plaintiff further stated that he did not have a savings account or own any real property, stocks, or bonds. (R. 409.)

The Commissioner argues that requiring repayment would not defeat the purpose of the Act because Plaintiff's expenses are less than his monthly disability checks. (Def.'s Resp. at 9.) The Commissioner also argues that requiring repayment would not be against equity and good conscience because Plaintiff has not changed his position for the worse or relinquished a valuable right, as set forth in the regulations. (*Id*. at 9-10.)[9]

Resolution of this issue hinges on facts that may require further development in the record, such as whether Plaintiff would be deprived of food, clothing, medical treatment, or insurance if he were required to repay the overpayment. Accordingly, this case is remanded to the ALJ for consideration as to whether recovery of the overpayment would defeat the purpose of the Act or be against equity and good conscience pursuant to 20 C.F.R. §§ 404.508 and 404.509.

---

[9] Although Plaintiff argues that requiring him to make repayments would be "inequitable," he does not explain how he changed his position for the worse or relinquished a valuable right. (Pl.'s Mem. at 11-12.)

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, and the case is remanded for consideration of whether requiring Plaintiff to repay the overpayment would defeat the purpose of the Act or be against equity and good conscience. The Commissioner's motion for summary judgment is denied.

IT IS SO ORDERED.

_____
GERALDINE SOAT BROWN
United States Magistrate Judge

DATED: January 22, 2007